IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| In the Matter of<br><br>TYLER J., by and through his Parents, CHERYL ANN and KEVIN J.,<br><br>      Plaintiffs,<br><br>  vs.<br><br>DEPARTMENT OF EDUCATION, STATE OF HAWAII, and School for Examining Essential Questions of Sustainability ("SEEQS") a Public Charter School, State of Hawaii,<br><br>      Defendants. | CIVIL NO. 14-00121 DKW-KSC<br><br>**ORDER AFFIRMING THE DECISION OF THE ADMINISTRATIVE HEARINGS OFFICER** |

## ORDER AFFIRMING THE DECISION OF THE
## ADMINISTRATIVE HEARINGS OFFICER

This appeal concerns the administrative hearings officer's ("AHO")

determination of Tyler J. ("Student") and Cheryl and Kevin J's ("Parents") request

for due process following the issuance of Student's May 6, 2013 Individualized

Education Program ("IEP") for the 2013-14 school year. Because Parents have not

shown by a preponderance of the evidence that the AHO's February 24, 2014

decision should be reversed, the Court affirms that decision.

## BACKGROUND

Student was 11 years old at the time of the AHO's February 24, 2014 decision ("Decision"). He has been eligible to receive special education and related services pursuant to the IDEA under the category of "other health disability." Decision at 4. The AHO found that Student "displays some behaviors consistent with ASD (autism spectrum disorder), [but] he has not been medically diagnosed . . . ." *Id.* In relevant part, the IEP describes Student's medical history and diagnoses as follows:

> [Student]'s medical history includes nocturnal enuresis until the age of five years, follow-up visits with specialists for stomach issues, allergies, asthma, a possible autoimmune condition, a history of febrile seizures, and Junior Rheumatoid Arthritis. He is prescribed medications. Mother is planning to have Tyler start sessions with Psychiatrist William Bolman to address behavioral concerns. There is a family history of Asperger's Syndrome, Attention Deficit Hyperactivity Disorder, Obsessive Compulsive Disorder, Diabetes, and Ehrlos-Danlos Syndrome.

Pet. Ex. 6 (IEP) at 2. The AHO also noted that "[t]he psychiatrist's November 21, 2013 child psychiatric evaluation reported Student with an Asperger Syndrome diagnosis." Decision at 4; *see* Pet. Exs. 3, 4.

Although there does appear to be some confusion as to Student's specific timeline of attendance at various schools leading up to Parents' due process request, including some misstatements of that timeline by the AHO, none of those discrepancies are material. Student was homeschooled until his fourth grade year

when Parents enrolled Student "at Hawaii Tech Academy, a charter school that offers in-class instruction once a week and an online curriculum supplemented with materials that are brought home." Resp. Ex. 10 at 000124. However, Student's attendance at Hawaii Tech Academy was very brief, and Parents resumed homeschooling for the remainder of his fourth grade year.

Student attended Maʻemaʻe Elementary School for his fifth grade year. According to Parents, the IEP team at Maʻemaʻe "went above and beyond in making [Student's] fifth grade year a success." Record on Appeal ("ROA") Ex. 1 (Due Process Request) at 000004. The IEP at issue in this appeal was developed toward the end of Student's fifth grade year at Maʻemaʻe.

Student's DOE home school for his sixth grade year would have been Kawananakoa Middle School. However, prior to attending Kawananakoa, Parents removed Student from the DOE system and enrolled him in the School for Examining Essential Questions of Sustainability ("SEEQS"), a charter school. Decision at 4. Parents explained the reason for this change as follows:

> We were told by the Principal of Kawananakoa (during the orientation of the incoming 6th graders—who is now retired) that KMS does not have the resources to accommodate the needs of Tyler. We moved on without a desire to go back.

> We did research and applied [Student] to be placed at SEEQS (School for Examining Essential Questions of Sustainability). BEFORE applying, [mother] repeatedly asked if SEEQS was appropriately able to accommodate [Student's] needs as an autistic (Asperger's) child.

> [Mother] was assured this was the case. [Parents] trusted [that
> SEEQS] were more organized and prepared.

ROA Ex. 1 (Due Process Request) at 000005.

At the time, SEEQS was a new charter school and was still getting

organized. For example, at the beginning of Student's sixth grade year, SEEQS

"had not received the required permits to hold classes in its building" and

consequently "conducted its 2 classrooms in a chapel and outdoors, under a tent-

like structure." Decision at 5. Additionally, SEEQS did not initially obtain a copy

of Student's IEP. Mother testified that she sent a copy of Student's IEP to the

SPED teacher at SEEQS shortly after the first meeting of SEEQS staff, parents and

teachers, ROA Ex. 1 (Due Process Request) at 000005. Several SEEQS leaders

and teachers testified that SEEQS received Student's IEP, along with a packet of

others, during the first or second week of school. *See, e.g.*, Hearing Tr. at 146:3–8,

247:7–13.

Shortly after beginning at SEEQS, Student's SPED teacher became ill and

the general education teachers filled in to implement Student's IEP. Hearing Tr. at

289:24–290:19; Decision at 6. A new SPED teacher began in mid-September a

few weeks after the departure of the first one. A few weeks later, on October 4,

2013, Parents participated in a student-led conference. This conference was the

last straw in Parents' apparent dissatisfaction with SEEQS. According to Parents:

4

> [At the conference,] [w]e tried to convey our challenges with the
> school as it pertained to [Student] and his education, growth and
> maturation or lack thereof. . . . We were very concerned that [Student]
> could not and did not present to us any completed assignments. We
> were very disturbed that he continuously wrote out he didn't
> understand, complete, participate or was ousted from his assignments.
> No one knew what we were talking about—they did not read his
> personal evaluations. . . . We walked away from that meeting
> convinced that SEEQS was not able to meet his basic needs as stated
> in the IEP, disappointed that it was obvious they did not have a clue as
> to what kind of child [Student] is (as an autistic child) and w[e were]
> very distraught at the lack of communication we had from the school
> with regard to his not turning in homework regularly.

ROA Ex. 1 (Due Process Request) at 000006–000007. Consequently, soon after
that conference, Parents withdrew Student from enrollment at SEEQS.
Decision at 9. Parents then enrolled Student at Variety School, which Student
briefly attended. Ultimately, Parents returned to homeschooling Student, when the
DOE and Parents could not reach an agreement for the DOE to pay for Student's
attendance at Variety School. Hearing Tr. at 26:22–27:1.

On October 17, 2013, Parents filed their due process request for review of
the May 6, 2013 IEP as it was implemented at SEEQS. The IEP provided Student
with special education and a variety of other supplementary aids and services,
program modifications, and supports.[1] Pet. Ex. 6 (IEP) at 8.

---

[1]Specifically, the supplementary aids and services, program modifications, and supports
provided in the IEP include: preferential seating, repeated directions, check for understanding,
visual cues for instruction/directions, copy of teacher's notes from class instruction, daily planner
check, extended time for homework and quizzes/tests, and use of an iPad in the classroom.

After a hearing on Parents' due process request on January 23–24, 2014, the

AHO issued a decision on February 24, 2014, concluding that:

> Petitioners have not shown that procedurally and substantively, the May 6, 2013 IEP denied Student a FAPE.

> Specifically, Petitioners have not shown that:

>> - The DOE failed to implement Student's May 6, 2013 IEP; failed to provide the preferential seating and other accommodations listed in the May 6, 2013 IEP until the last 2 weeks of the first quarter; or that the DOE failed to communicate with parents, despite parents' emails, phone calls, and visits;
>> - The program offered through the May 6, 2013 IEP was not appropriate, and Student has not improved in any area, and has regressed academically. Further, Petitioners have not shown that Student was not making meaningful educational gains at the DOE charter school, or that the DOE charter school inappropriately allowed Student to opt-out of assignments and make inappropriate choices; and
>> - The placement at the DOE charter school was inappropriate, not safe, or that bullying was not properly addressed.

> Further, Petitioners have not shown that the private school would provide an appropriate program and placement for Student.

Decision at 24.

> Parents' appeal of this decision is presently before the Court.

## STANDARD OF REVIEW

### I.   IDEA Overview

"The IDEA is a comprehensive educational scheme, conferring on disabled students a substantive right to public education and providing financial assistance to enable states to meet their educational needs." *Hoeft ex rel. Hoeft v. Tucson Unified Sch. Dist.*, 967 F.2d 1298, 1300 (9th Cir. 1992) (citing *Honig v. Doe*, 484 U.S. 305, 310 (1988)).  It ensures that "all children with disabilities have available to them a free appropriate public education [("FAPE")] that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living[.]"  20 U.S.C. § 1400(d)(1)(A).  The IDEA defines FAPE as special education and related services that --

> (A) have been provided at public expense, under public supervision and direction, and without charge;
> (B) meet the standards of the State educational agency;
> (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and
> (D) are provided in conformity with the individualized education program required under section 1414(d) of this title.

20 U.S.C. § 1401(9).  To provide a FAPE in compliance with the IDEA, a state educational agency receiving federal funds must evaluate a student, determine whether that student is eligible for special education, and formulate and implement an IEP.  20 U.S.C. § 1414.  The IEP is to be developed by an "IEP Team"

composed of, *inter alia*, school officials, parents, teachers and other persons knowledgeable about the child. 20 U.S.C. § 1414(d)(1)(B).

"Procedural flaws in the IEP process do not always amount to the denial of a FAPE." *L.M. v. Capistrano Unified Sch. Dist.*, 556 F.3d 900, 909 (9th Cir. 2009) (citations omitted). Once a procedural violation of the IDEA is identified, the court "must determine whether that violation affected the substantive rights of the parent or child." *Id.* (citations omitted). "[P]rocedural inadequacies that result in the loss of educational opportunity, or seriously infringe the parents' opportunity to participate in the IEP formulation process, clearly result in the denial of a FAPE." *Id.* (alteration in original) (citations and quotation marks omitted).

Compliance with the IDEA does not require school districts to provide the "absolutely best" or "potential-maximizing" education. *J.W. v. Fresno Unified Sch. Dist.*, 626 F.3d 431, 439 (9th Cir. 2010) (citation and internal quotation marks omitted). Rather, school districts are required to provide only a "'basic floor of opportunity.'" *Id.* (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 201 (1982)). The FAPE need only be "appropriately designed and implemented so as to convey [the][s]tudent with a meaningful benefit." *Id.* at 433 (citations and quotation marks omitted).

## II.  **Standard of District Court Review**

The standard for district court review of an administrative decision under the

IDEA is set forth in 20 U.S.C. § 1415(i)(2)(C), which provides:

> In any action brought under this paragraph, the court—
>
>> (i) shall receive the records of the administrative proceedings;
>>
>> (ii) shall hear additional evidence at the request of a party; and
>>
>> (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

This standard requires that the district court give "'due weight'" to the

administrative proceedings.  *Capistrano*, 556 F.3d at 908 (quoting *Rowley*, 458

U.S. at 206) (some citations omitted).  The district court, however, has the

discretion to determine the amount of deference it will accord the administrative

ruling.  *J.W. ex rel. J.E.W. v. Fresno Unified Sch. Dist.*, 626 F.3d 431, 438 (9th Cir.

2010) (citing *Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307, 1311 (9th Cir.

1987)).  In reaching that determination, the court should consider the thoroughness

of the hearings officer's findings, increasing the degree of deference where said

findings are "'thorough and careful.'"  *Capistrano*, 556 F.3d at 908 (quoting

*Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 892 (9th Cir. 1995)).

The district court should give "substantial weight" to the hearings officer's

decision when the decision "evinces his careful, impartial consideration of all the

evidence and demonstrates his sensitivity to the complexity of the issues

presented." *Cnty. of San Diego v. Cal. Special Educ. Hearing Office*, 93 F.3d 1458, 1466–67 (9th Cir. 1996) (citation and quotation marks omitted). Such deference is appropriate because "if the district court tried the case anew, the work of the hearing officer would not receive 'due weight,' and would be largely wasted." *Wartenberg*, 59 F.3d at 891. "[T]he ultimate determination of whether an IEP was appropriate," however, "is reviewed de novo." *A.M. ex rel. Marshall v. Monrovia Unified Sch. Dist.*, 627 F.3d 773, 778 (9th Cir. 2010) (citing *Wartenberg*, 59 F.3d at 891).

> A court's inquiry in reviewing IDEA administrative decisions is twofold:
>
> First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits? [*Rowley*, 458 U.S. at 206–07] (footnotes omitted). If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more. *Id.* at 207.

*J.L. v. Mercer Island Sch. Dist.*, 592 F.3d 938, 947 (9th Cir. 2010) (some citations omitted).

The burden of proof in IDEA appeal proceedings is on the party challenging the administrative ruling. *Hood v. Encinitas Union Sch. Dist.*, 486 F.3d 1099, 1103 (9th Cir. 2007) (citations omitted). The challenging party must show, by a preponderance of the evidence, that the hearing decision should be reversed. *J.W.*, 626 F.3d at 438 (citation omitted).

## **DISCUSSION**

Parents assert that the AHO incorrectly concluded that SEEQS implemented the May 6, 2013 IEP such that there was no denial of FAPE.[2]  However, because Parents have not satisfied their burden of showing by a preponderance of the evidence that the AHO decision should be reversed, that decision is affirmed.

As a threshold matter, the Court notes that Parents are pro se in this appeal, and also represented themselves before the AHO.  In their opening brief of this appeal, Parents filed only a two-page document—essentially, a list of arguments with no reference to evidence in the record.  Parents did not file a reply brief.  At the hearing, and in light of Parents' pro se status, the Court allowed Parents to file a supplemental brief, with specific direction to include administrative record citations to support their arguments.

In addition to their supplemental brief, Parents filed a motion for the Court to consider documents regarding Student's Asperger's Syndrome diagnosis, the dates of Student's attendance at Maʻemaʻe Elementary, and the circumstances and dates of Student's attendance at Variety School.  Dkt. Nos. 52, 55.  Because the IDEA permits the Court to "hear additional evidence at the request of a party," 20 U.S.C. § 1415(i)(2)(C), the Court grants Parents' motion to make these documents part of the record in this case.  The Court notes, however, that none of

---

[2]On appeal, Parents do not challenge the adequacy and appropriateness of the IEP itself to address Student's needs.  Their challenge relates to the implementation of the IEP at SEEQS.

these documents appear to provide any new information that is not already contained in the administrative record. For example, the Court has already noted above the correct dates of Student's attendance at various schools, which information was gleaned from the existing record, as illustrated by the DOE's response brief.[3] Dkt. No. 56 at 2. Also, the reports of Dr. Bolman and Dr. Okamoto regarding Student's Asperger's diagnosis are similarly already part of the administrative record. *See* Pet. Exs. 3, 4.

The Court now addresses, in turn, each of Parents' contentions on appeal.

## I.     Student's Eligibility Under "Other Health Disability"

Parents' initial brief expresses discontent with the fact that the IEP listed Student as eligible for services under the category of "other health disability," instead of "autism." Parents assert that autism should have been the appropriate category given Student's diagnosis of Asperger's Syndrome, an autism spectrum disorder. The DOE explained in 2012, in a notice from the principal at Maʻemaʻe, that "[a]lthough [Student] displays some behaviors consistent with ASD [(autism spectrum disorder)], he has not been medically diagnosed and the team felt that the category of OHD [(other health disability)] better represented his disability at this point in time." Resp. Ex. 5 (5/9/12 Prior Written Notice) at 000039. After this

---

[3]Parents contend that the AHO's misstatements of Student's educational timeline should be a basis for reversal. However, because the AHO's conclusions were not based on the specific timeline in any way, these misstatements provide no basis for reversal.

notice, but before the drafting of Student's May 6, 2013 IEP, Dr. Bolman

diagnosed Student with Asperger's Syndrome, an autism spectrum disorder.

Pet. Ex. 3.

As the DOE correctly points out, Parents only raised this concern for the

first time as part of their initial filing before this Court—it was not part of their due

process request, nor was it an issue addressed by the AHO. "As a general rule,

arguments not raised at an administrative hearing cannot be raised for the first time

on appeal to the district court." *James M. v. DOE*, 803 F. Supp. 2d 1150, 1164 (D.

Haw. 2011); *see also Clyde K. v. Puyalup Sch. Dist.*, No. 3, 35 F.3d 1396, 1399 n.4

(9th Cir. 1994), *superseded by statute on other grounds*, as recognized in *M.L. v.

Federal Way Sch. Dist.*, 341 F.3d 1052, 1063 n.7 (9th Cir. 2003) ("Because they

failed to raise the issue at either the administrative hearing or in the district court,

we decline to consider it here."). Because this issue was not first raised before the

AHO and adjudicated there, the Court is not in a position to reach any

determination of the issue here on appeal.

That said, the Court notes that the record does not evidence the DOE's

awareness of Dr. Bolman's Asperger's diagnosis prior to the drafting of the May

2013 IEP. "'[A]n IEP must take into account what was, and was not, objectively

reasonable when the snapshot was taken, that is, at the time the IEP was drafted.'"

*Adams v. State of Oregon*, 195 F.3d 1141, 1149 (9th Cir. 1999) (quoting *Fuhrmann*

13

*v. East Hanover Bd. of Educ.*, 993 F.2d 1031, 1041 (3d Cir. 1993)). In fact, the record indicates that Parents sent a draft (but not final) version of one of Dr. Bolman's reports (that included an Asperger's diagnosis) to SEEQS on September 3, 2013, several months *after* the drafting of the IEP. Resp. Ex. 12 at 000150–000154; *see* Pet. Ex. 6 (IEP) at 2 (noting that "Mother is planning to have [Student] start sessions with Psychiatrist William Bolman to address behavioral concerns").

Additionally, Parents have provided no evidence to suggest that Student's IEP should or would have been any different even if Student was listed as eligible for IDEA services under the category of autism. The AHO recognized, because it was part of the record before him, that Student was diagnosed by Dr. Bolman with Asperger's Syndrome. Decision at 4; *see* Pet. Exs. 3, 4. However, the category of Student's eligibility for special education was of no import in the AHO's decision. Further, Parents admitted to the Court at the appeal hearing that because Student "has already been diagnosed as [eligible for] special ed[ucation], his IEP already says specific things, specific hours, and whether or not he's autistic or not really has no bearing over anything." In short, there is no evidence in the record to indicate that making Student eligible to receive special education under either the category of "autism" or "other health disability" would make any difference in the actual programs and services planned for in the IEP. Parents would need to show

that having Student categorized as eligible under "other health disability" resulted in the loss of some educational opportunity.  There is no such evidence.

## II.  __Implementation of the IEP by SEEQS__

Parents contend that SEEQS failed to implement the IEP and that this amounted to a denial of FAPE.  The AHO concluded that there were no procedural inadequacies in the implementation of the IEP by SEEQS, and even if that were not the case, there was no denial of educational benefits or FAPE.  Decision at 17.  The Court agrees with the AHO that none of the instances noted by Parents amounts to a material failure to implement Student's IEP.

The Ninth Circuit set forth the following explanation of a "material failure to implement an IEP" that violates the IDEA:

> A material failure occurs when there is more than a minor discrepancy between the services a school provides to a disabled child and the services required by the child's IEP. . . . [W]e clarify that the materiality standard does not require that the child suffer demonstrable educational harm in order to prevail.  However, the child's educational progress, or lack of it, may be probative of whether there has been more than a minor shortfall in the services provided.  For instance, if the child is not provided the reading instruction called for and there is a shortfall in the child's reading achievement, that would certainly tend to show that the failure to implement the IEP was material.  On the other hand, if the child performed at or above the anticipated level, that would tend to show that the shortfall in instruction was not material.  We also emphasize that nothing in this opinion weakens schools' obligation to provide services "in conformity with" children's IEPs.  § 1401(9).  IEPs are clearly binding under the IDEA, and the proper course for a school that wishes to make material changes to an IEP is to reconvene the

IEP team pursuant to the statute—not to decide on its own no longer
to implement part or all of the IEP.  *See* §§ 1414(d)(3)(F), 1415(b)(3).

*Van Duyn v. Baker Sch. Dist.*, 502 F.3d 811, 822 (9th Cir. 2007).

Although Parents do not argue in terms of a "material failure to implement,"

they point to the fact that SEEQS did not have Student's IEP by the first day of

school of his sixth grade year, and that this should be the basis for a determination

of a denial of FAPE.  The DOE does not dispute that SEEQS did not have the IEP

on the first day of school.  But the evidence indicates that, at the latest, SEEQS had

Student's IEP by the second week of school.[4]  ROA Ex. 1 (Due Process Request)

at 000005; Hearing Tr. at 146:3–8, 247:7–13.  The AHO concluded that:

> [E]ven though the DOE did not have a copy of Student's May 6, 2013
> IEP when school started on August 5, 2013, the DOE was not in
> violation for failing to implement the IEP.  As the evidence showed,
> during the first few days of the school year, the emphasis was on
> orientation and community building, not focusing on the services and
> accommodations listed in the IEP.  As noted above, the failure to
> implement the IEP must be a material failure.  The evidence did not
> show a material failure to implement the IEP.

Decision at 17.  The Court concludes that the fact that SEEQS did not have a copy

of the IEP on the first day of school did not amount here to a material failure to

implement Student's IEP.

---

[4]There is evidence in the record that although SEEQS may not have had a copy of Student's IEP
on hand on the first day of school, SEEQS was familiar with Student's IEP "from the very first
day," Hearing Tr. at 146:11–12, and had reviewed the IEP "[w]ithin the first week of school,"
Hearing Tr. at 306:13–21.  By that first week, SEEQS had also developed a "cheat sheet," a
quick reference guide of Student's IEP.  Hearing Tr. at 148:3–15.  Regardless of whether SEEQS
received the IEP in the first or second week of school, the difference did not amount to a material
failure to implement the IEP under *Van Duyn*.

Stated simply, Parents have failed to provide any concrete evidence that not

having Student's IEP in the first week of school impeded Student's educational

progress, evidence that could amount to a material failure to implement the IEP.

As noted by the Ninth Circuit in *Van Duyn*, Parents could have provided evidence

to establish how the lack of IEP programs in that week negatively affected

Student's performance and achievement. Instead, Parents seem to be relying on

the fact that not having the IEP on the first day, *on its own*, amounts to a material

failure. That is simply not the case under the materiality analysis mandated by *Van

Duyn*. 502 F.3d at 822–825. Without any other evidence of the actual material

impact on Student, and together with the uncontroverted evidence that SEEQS was

actually implementing Student's IEP within days of the beginning of school,

Parents have not shown by a preponderance of the evidence that the AHO's

determination on this issue should be reversed.[5]

Parents also briefly argue that SEEQS did not implement the IEP when it did

not provide Student with an iPad. The IEP provides that on a "when needed"

basis, Student should be allowed to "[u]se an iPad in the classroom." Pet. Ex. 6

---

[5]In their supplemental brief, Parents also point out that the IEP was effective as of the start of the
school year, and thus there was a denial of FAPE when SEEQS did not implement it on the first
day. There is no dispute from the DOE that the IEP was effective as of the beginning of
Student's sixth grade year. The AHO, in fact, noted that "the May 6, 2013 IEP and its placement
provision was already in place" on the first day of school at SEEQS. Decision at 21. Student's
IEP was valid and in place, ready to be implemented from the first day. The Court holds,
however, that the fact that SEEQS may not have initiated all of Student's IEP programs (that
were already in effect) in the first week of orientation was a minor discrepancy permissible under
*Van Duyn* and did not amount to a material failure to implement the IEP.

(IEP) at 8.  Despite Parents' protests now that an iPad should have been provided for Student, Parents have not proffered any evidence that would suggest the iPad was needed, and thus, that it would be necessary in order for SEEQS to implement the IEP.  To the contrary, the only evidence in the record on this point establishes that none of the educators at SEEQS ever felt that the iPad was needed when they were working with Student.  *See* Hearing Tr. at 265:7–17; 334:2–18.

Finally, to the extent that it is necessary, the Court also concludes that even if any of the above-mentioned acts was a procedural inadequacy, none of those errors (or the sum of them) resulted in a denial of FAPE.  The Court concludes that the fact that SEEQS may not have had Student's IEP during their opening orientation week and the fact that Student was not provided with an iPad did not result in the loss of educational opportunity for Student, or violate the substantive rights of Student or Parents.  *L.M. v. Capistrano Unified Sch. Dist.*, 556 F.3d 900, 909 (9th Cir. 2009).

## III.  **Bullying**

Parents raise concerns about the safety of Student at SEEQS caused by bullying and the dangerous conduct of other students.  The AHO disposed of these concerns, concluding that:

> Although Mother testified that Student was bullied by another student who called him derogatory names, gave him the middle finger, and erased Student's group math answers off a white board, Mother acknowledges that the DOE charter school rolled out an anti-bullying

> campaign. The evidence showed that the school leader promptly
> responded in writing to Mother's concerns of bullying.
> Although parents also brought up safety concerns with students sitting
> in the street and pocket knives on campus, the school leader promptly
> address[ed] these isolated instances when they occurred. Further,
> these instances did not involve Student directly.

Decision at 22. On appeal, Parents take exception to the AHO's conclusions, but have provided no evidence to suggest that the AHO's findings should be reversed. Even assuming, as Parents contend, that the anti-bullying campaign at SEEQS only happened because Parents brought the issue to the school's attention, Parents have still not provided actual evidence suggesting that the campaign was unsuccessful or that those efforts failed to curb any bullying of Student. For purposes of this appeal, the Court's concern is whether any bullying behavior directed at Student resulted in the loss of educational opportunity or benefit; but there is simply no evidence of that. Although Parents may not agree with the methods employed by SEEQS to address these issues, the fact that SEEQS was addressing them (and the fact that there is no evidence that those methods were ineffective) indicates that Student was not being denied a FAPE as a result of any bullying behavior.

## IV.  **Placement at Variety School**

Parents also seek placement at Variety School. As the AHO noted, the question of private placement would only arise if Parents successfully showed that there was a denial of FAPE. Decision at 23. However, because the Court now concludes that Parents have not satisfied their burden of proving a denial of FAPE,

19

the question of placement is moot.  *See Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 247 (2009) ("Parents 'are entitled to reimbursement *only* if a federal court concludes both that the public placement violated IDEA and the private school placement was proper under the Act.'"  (quoting *Florence Cty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 15 (1993)) (emphasis in original)).

Further, the Court notes that the AHO was correct in concluding that Parents "did not present sufficient evidence to show that the private school offered a program and placement that was appropriate for Student."  Decision at 23.  "The burden is on parents seeking reimbursement to demonstrate that the private school in which they have chosen to enroll their child is appropriate."  *Heyly T.S. v. Hawaii*, 2013 WL 1412272, at *6 (D. Haw. April 5, 2013).  In most cases, testimony from parents alone will not be sufficient to establish the appropriateness of private placement.  *See id.* ("The only evidence Parents presented regarding [Student's] current private placement was Parents' own subjective impressions that [Student's] communication skills and eye contact levels had improved since attending [private school]. . . . Parents could have presented evidence of [private school's] programming, staffing, and resources, and their fitness for [Student's] particular needs, from a witness qualified to discuss them.  They did not.").

The Court is aware that Parents' new letter from Dr. Okamoto, which they attached to their supplemental brief, opines that "Variety School would be an

appropriate placement for [Student], as they can work with his solid intelligence and problem solving abilities, yet help him progress at interacting with others, especially peers." Dkt. No. 55 (attached 12/19/14 Letter from Dr. Okamoto). However, Dr. Okamoto provides no evidence to support this opinion, and there is no evidence of Dr. Okamoto's ability or expertise to opine on what services Variety School has provided or can provide in order to meet Student's needs. In order to show what constitutes a proper placement under the IDEA, Parents must at least "'demonstrate that the placement provides educational instruction specially designed to meet the unique needs of a handicapped child, supported by such services as are necessary to permit the child to benefit from instruction.'" *C.B. v. Garden Grove Unified Sch. Dist.*, 635 F.3d 1155, 1159 (9th Cir. 2011) (quoting *Frank G. v. Bd. of Educ.*, 459 F.3d 356, 365 (2d Cir. 2006)). Accordingly, even if the Court were to conclude there was a denial of FAPE (which it does not), Parents have not provided evidence that would establish anything specifically with regard to Variety's ability to meet Student's unique needs, and thus cannot establish that Variety is a proper placement.

**V.    Stay Put**

Finally, Parents also seek stay put payments from the time of the due process filing through the conclusion of this case. The stay put provision of the IDEA provides:

Except as provided in subsection (k)(4), during the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child, or, if applying for initial admission to a public school, shall, with the consent of the parents, be placed in the public school program until all such proceedings have been completed.

20 U.S.C. § 1415(j). "[T]he stay put provision does not apply unless and until a request for a due process hearing is filed." *K.D. v. DOE*, 665 F.3d 110, 1117 (9th Cir. 2011). Although the statute itself does not speak of payment or reimbursement, the Ninth Circuit has interpreted the stay put provision as requiring a school district to fund the child's "then-current educational placement" at a private school, when applicable, during the pendency of any administrative or judicial proceedings under the IDEA. *See Clovis Unified Sch. Dist. v. Cal. Office of Admin. Hearings*, 903 F.2d 635, 641 (9th Cir. 1990) (per curiam). The IDEA does not define the phrase "then-current educational placement." The Ninth Circuit, however, has interpreted the phrase to mean "the placement set forth in the child's last implemented IEP." *Capistrano*, 556 F.3d at 902–03.

There is no dispute here that Parents unilaterally placed Student at Variety School. In other words, the DOE never consented, in an IEP or otherwise, that Variety School was Student's proper placement. *See* Pet. Ex. 6 (May 9, 2013 Prior Written Notice) ("This program [(the May 6, 2013 IEP)] will be implemented at [Student's] home school in a combination special education and general education

setting, *on a DOE public school campus*.") (emphasis added). Additionally, there is no administrative or judicial decision in lieu of DOE consent that would establish that Variety School is the appropriate placement. *See K.D.*, 665 F.3d at 1118 ("Where a parent unilaterally changes the placement of a child, but a subsequent administrative or judicial decision confirms that the parental placement is appropriate, the decision 'constitute[s] an agreement by the State to the change of placement' and the placement becomes the 'current educational placement' for the purposes of the stay put provision." (quoting *Clovis*, 903 F.2d at 641)).

Consequently, Variety School cannot be Student's then-current educational placement for purposes of stay put. Parents are therefore not entitled to stay put payments for Student's attendance at Variety School.[6]

---

[6]Parents previously provided a copy of a draft settlement agreement between Parents and the DOE that provided for the DOE to pay for Student's attendance at Variety for his sixth grade year. *See* Dkt. No. 14, Ex. B. However, the parties never reached an agreement on this settlement offer. Regardless, even if all parties had agreed to that settlement, that agreement still would not have established Variety School as Student's then-current educational placement for stay put purposes, without an additional provision agreed upon by all parties that Variety School was the appropriate placement going forward. *See K.D.*, 665 F.3d at 1120–1121 ("[W]e hold that [private school] is not [Student's] stay put placement because the DOE only agreed to pay tuition for the limited 2006–07 school year, and never affirmatively agreed to place [Student] at [private school].").

## **CONCLUSION**

The Court grants Parents' motion to make certain documents part of the

record (Dkt No. 52). The Administrative Hearings Officer's February 24, 2014

decision is hereby AFFIRMED.

IT IS SO ORDERED.

DATED: February 24, 2015 at Honolulu, Hawai'i.

<br>

Derrick K. Watson
United States District Judge

<br><br>

TYLER J., et al. v. DOE, et al.; CV 14-00121 DKW-KSC; ORDER AFFIRMING
THE DECISION OF THE ADMINISTRATIVE HEARINGS OFFICER